Filed 3/27/26  P. v. Tidwell CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C101936 |
| Plaintiff and Respondent, | (Super. Ct. No. 23FE007841) |
| v. | |
| VERNON LAMONT TIDWELL, | |
| Defendant and Appellant. | |

A jury found defendant Vernon Lamont Tidwell guilty of possession of a firearm by a person previously convicted of a felony (Pen. Code, § 29800, subd. (a)(1)—count one),[1] purchasing and receiving a firearm while prohibited from doing so by a protective order (§ 29825, subd. (a)—count two), misdemeanor driving a vehicle while under the influence of alcohol (Veh. Code, § 23152, subd. (a)—count three), misdemeanor driving

---

[1]  Undesignated statutory references are to the Penal Code.

1

a vehicle while his license was suspended or revoked for a violation of Vehicle Code section 23152 (Veh. Code, § 14601.2, subd. (a)—count five), and misdemeanor driving without a required ignition interlock device (Veh. Code, § 23247, subd. (e)—count six).[2] With respect to count three, the jury found true that defendant willfully refused to submit to a chemical test (Veh. Code, § 23577) and had a prior conviction for violating Vehicle Code section 23152, subdivision (b). In a bifurcated proceeding, the jury found true that defendant had a prior strike conviction. (§§ 667, subds. (b)-(i), 1170.12.)

The trial court sentenced defendant to a total term of four years in state prison. The court imposed two years doubled to four years for the prior strike on count one. The court imposed but stayed four years on count two pursuant to section 654. The court sentenced defendant to time served on count three. The court imposed and then stayed concurrent sentences on counts five and six pursuant to section 654.

On appeal, defendant argues: (1) the trial court erred in denying his motion to suppress evidence seized following an unlawful detention, (2) admission of a recorded 911 call violated his Sixth Amendment right to confrontation, (3) the court erred in admitting the 911 call as a spontaneous declaration, (4) the court erred in its application of the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (Racial Justice Act), (5) the court erred in removing defendant from a critical phase of trial, and (6) clerical errors in the abstract of judgment require correction. The People concede one of the alleged clerical errors and note an additional error. We will order the abstract of judgment and sentencing minute order corrected to conform to the jury's finding of only one prior strike and the oral pronouncement of judgment. The judgment is affirmed.

---

[2] The jury found defendant not guilty of misdemeanor driving a vehicle with a blood alcohol percentage at or above 0.08. (Veh. Code, § 23152, subd. (b)—count four.)

# I.  BACKGROUND

At around 9:00 p.m. on May 27, 2023, a police officer was dispatched to an area near a grocery store based on a 911 call for service regarding a drunk driver.  The 911 call, which is detailed in Part II.B.2 *post*, was played for the jury.

When the officer arrived, she saw an SUV that appeared to match the caller's description.  About five people were standing next to it.  When the officer pulled into the parking lot, several of those people walked toward the sidewalk and defendant got into the driver's seat of the SUV.  A video taken from the officer's car was played for the jury.  It shows that after the officer pulled in behind defendant, defendant's red taillights illuminated, and he drove forward several feet.  The officer followed and briefly turned on her siren.  Defendant continued driving slowly for a few more feet before stopping and getting out of the SUV.

The officer noticed defendant "had bloodshot, watery eyes" and walked with "an unsteady gait."  She could "smell the odor of an alcoholic beverage coming from his person."  The officer explained, based on her training and experience, that these were objective signs of intoxication.

A second officer arrived and conducted a field sobriety test on defendant.  The officer explained that defendant exhibited signs of impairment during the horizontal gaze nystagmus test.  Defendant did not exhibit any noteworthy signs of impairment during the alphabet test, the counting test, or the Romberg test.  The officer observed objective signs of impairment—slurred speech, bloodshot, watery eyes, and a strong odor of alcohol coming from defendant.

Officers found a firearm and two empty bottles of vodka in the SUV.  There was no ignition interlock device.

At 9:55 p.m., defendant was administered a breathalyzer test, which showed his blood alcohol concentration was .101 percent.  Three minutes later, a second test showed

3

defendant's blood alcohol concentration was .091 percent.  Based on these tests, the second officer opined that defendant was under the influence of alcohol.

## II.  DISCUSSION

*A.      Motion to Suppress*

Defendant argues the trial court erred by denying his motion to suppress evidence seized following an unlawful detention.

*1.        Suppression Hearing*

Prior to trial, the trial court held a suppression hearing regarding whether the officer who responded to the 911 call had a reasonable suspicion to conduct an investigative stop.  The officer testified at the hearing, and a video of the stop was played for the court.  The officer testified that she was dispatched to the rear parking lot of a grocery store "in regards to a drunk driver call for service."  She testified that the 911 caller reported that the individual driving had admitted to being under the influence of alcohol.  The caller described the make and model of the vehicle and provided a license plate number.

The officer arrived five minutes later and saw a person matching the description that the caller gave get into the driver's seat of an SUV.  The SUV looked similar to the one the caller had described and had a license plate number that was only one letter different from what the caller had given.  The officer turned on her red forward-facing lights when defendant's taillights illuminated.  She explained she was concerned that defendant would "take off" and there would be a danger to others.  Defendant drove forward and then the officer turned on her overhead lights and siren.

Defense counsel argued the officer had initiated a traffic stop on the basis of only a call in which an individual said defendant had admitted being drunk.  Defense counsel argued this amounted to mere speculation that defendant was drunk.  Defense counsel also suggested there was no risk to the public because defendant was "more or less parked at the time" the officer initiated the stop.

The prosecutor responded that there was no speculation defendant was drunk. The caller said defendant admitted to drinking and then he was seen driving. Further, the caller gave a contemporaneous, detailed description that included a description of the location, vehicle, and defendant. When the officer arrived a few minutes later, she saw a vehicle with essentially the same license plate number, and defendant got into the vehicle and began to drive. The prosecutor argued that when the officer stopped defendant she had enough information to form a reasonable suspicion to justify the stop.

The trial court denied defendant's motion to suppress on the basis that the stop was supported by reasonable suspicion. The trial court explained, in part, that "at the time [the officer] arrived at the scene, she had information that there was someone there that had admitted to drinking and that was drunk and driving a vehicle. So at that point, I believe that a reasonable officer in the same or similar circumstances with the same or similar training and experience would have reasonable suspicion that criminal activity was afoot and that this individual was involved in that criminal activity." The trial court found that the license plate number and vehicle description were so close to the vehicle the officer observed that she could conclude this was the vehicle that was the subject of the 911 call. Further, the vehicle moved and, even if it had not, the fact that defendant got into the vehicle and turned the operating lights on was a sufficient basis to detain him long enough to confirm or dispel the officer's suspicions.

2.      *Reasonable Suspicion*

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) Our review is

limited to the record of the suppression hearing.[3]  (*People v. Moore* (2006) 39 Cal.4th 168, 171.)

"The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' [Citations.]  The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.' [Citation.]  The standard takes into account 'the totality of the circumstances—the whole picture.' [Citation.]  Although a mere ' "hunch" ' does not create reasonable suspicion, [citation] the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." (*Navarette v. California* (2014) 572 U.S. 393, 396.)  Moreover, reasonable suspicion may be based on information supplied by others, such as an anonymous tip.  (*Ibid.*; *People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

Defendant argues his detention was not justified because there was "no information that the caller had any personal information that [defendant] was driving a vehicle while intoxicated" and suggests *Florida v. J.L.* (2000) 529 U.S. 266 (*J.L.*) and *People v. Wells, supra*, 38 Cal.4th 1078 are of some assistance to him.  He is incorrect.

In *J.L., supra*, 529 U.S. 266, the United States Supreme Court held that, without more, an anonymous tip that a person is carrying a gun is not sufficient to justify a police officer's stop and frisk of that person.  (*Id*. at p. 268.)  The court concluded the tip did not contain sufficient indicia of reliability:  "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew

---

[3]  Defendant cites to the transcript of the 911 call even though neither the transcript nor the call itself are part of the record of the suppression hearing.

about the gun nor supplied any basis for believing he had inside information about J.L."
(*Id*. at p. 271.)

More recently, the United States Supreme Court held in *Navarette v. California, supra*, 572 U.S. 393, that an officer had reasonable suspicion to execute a traffic stop where a 911 caller reported that a vehicle had run her off the road. (*Id*. at p. 395.) First, the court explained that, even assuming the call was anonymous, it was sufficiently reliable to credit the caller's allegation. (*Id*. at p. 398.) The court explained that by reporting that she had been run off the road by a specific vehicle, "the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving" and "[t]hat basis of knowledge lends significant support to the tip's reliability." (*Id*. at p. 399.) Further, the fact that law enforcement confirmed the truck's location within 20 minutes after the 911 call suggests the caller reported the incident soon after she was run off the road: "That sort of contemporaneous report has long been treated as especially reliable." (*Ibid*.) Additionally, a caller's use of the 911 emergency system is an indicator of veracity. (*Id.* at p. 400.) Second, the court explained that the report of being run off the road created reasonable suspicion of an ongoing crime such as drunk driving to execute a traffic stop. (*Id*. at pp. 401-404.) Neither the absence of additional suspicious conduct after the vehicle was spotted by the officer nor other possible explanations for the driver's conduct negated the reasonableness of the officer's suspicion. (*Id*. at p. 403.)

Eight years before the U.S. Supreme Court decided *Navarette v. California, supra*, 572 U.S. 393, a majority of our Supreme Court reached a similar conclusion in *People v. Wells, supra*, 38 Cal.4th 1078.[4] The court concluded that an officer who had received a dispatch report of a possibly intoxicated driver of a blue van " 'weaving all over the roadway' " had a reasonable suspicion of intoxicated driving to justify a limited traffic

---

[4] Defendant quotes at length from the dissent.

7

stop before an accident could occur. (*Id*. at pp. 1080-1081.) The officer found a blue van in a location that matched the description provided to him but "did not observe the van weaving, speeding, or otherwise violating any traffic laws, perhaps because he stopped the van so soon after spotting it." (*Id*. at p. 1081.) Our Supreme Court explained that "*J.L.* presents a distinguishable situation" and an anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger and greater urgency for prompt action than a report of an individual in passive (and possibly legal) possession of a gun: "Police officers undoubtedly would be severely criticized for failing to stop and investigate a reported drunk driver if an accident subsequently occurred." (*Id*. at p. 1087.) These principles apply to the investigative stop at issue in this appeal.

Taken together, the 911 caller's statement that defendant had admitted to her that he was drunk, the fact the caller reported defendant was driving a specific vehicle at the time of the call, and the officer's subsequent observation of a man getting into the driver's seat of the same vehicle provided sufficient indicia of reliability and reasonable suspicion that defendant had been driving while intoxicated and was about to do so again. Defendant appears to argue that because the caller did not specify she personally saw defendant drinking alcohol, this was a stop based on a mere hunch. We disagree. Defendant further asserts there was no reasonable suspicion of exigency because, when the officer approached, his vehicle was parked. Given that defendant got into the driver's seat of the SUV when the officer approached, this assertion is unavailing. The officer had a reasonable basis to conclude defendant would drive away if she did not stop him. The trial court did not err in denying defendant's motion to suppress.

B.    *Admission of 911 Call*

Defendant raises two challenges to the admission of the 911 call at trial. First, defendant argues admission of the call violated his Sixth Amendment right to confrontation because the statements made in the recording were testimonial. Second,

8

defendant argues the trial court erred in admitting the recording under the spontaneous statement exception to the hearsay rule.  (Evid. Code, § 1240.)  We reject both assertions.

### 1.     Trial Court Proceedings

Prior to trial, the prosecutor sought to admit the audio recording of the 911 call as a spontaneous statement under Evidence Code section 1240.  Defendant argued it was hearsay because the caller would not be testifying.[5]  The trial court ruled the 911 call was admissible as a spontaneous statement.  Later, after the evidence was heard by the jury, defense counsel argued that "on the fourth page under line four" was "past the excited event."[6]  The trial court explained that it had listened to the entirety of the call before it ruled initially and had "concluded that all of the call was within the ambit of [Evidence Code section] 1240, that none of the call implicated [*Crawford* [7]] or the Sixth Amendment."  Further, the court found "that even if one were to construe line 4 as beyond the ambit of [Evidence Code section] 1240, that it's no longer within the context of the excited utterance or the contemporaneous observations of the event at a time before there was any basis or reason to contrive a story that there was a dimension of reliability by virtue of the timing and context.  [¶]  This language, even if one were to construe it in the fashion that you're advancing, [defense counsel], would not be prejudicial to the Defendant."

---

[5]  The prosecution had attempted to subpoena the caller, but could not locate her.  The court found the witness was unavailable.

[6]  Presumably, defense counsel was citing the transcript that was marked for identification at trial.  On line four of page four, the caller begins the following statement: "Um I'm not sure, I'm not sure where he went.  But he's really, oh I think he's on the parking lot over there behind [the grocery store] only down um down a little way.  I'm not sure."

[7]  *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

2.    *The Call*

"[Dispatcher]:  Sacramento Police Department, 911.

"[Caller]:  There's a man, a black man harassing me at my place where I live.

"[Dispatcher]:  What's your address?

"[Caller]:  Um um we're behind uh [the grocery store].  He is drunk and driving um a truck."

The dispatcher and the caller talked over each other clarifying that the caller lived on the street behind the grocery store.  The caller then gave a license plate number.

"[Dispatcher]:  Are you okay?  So, how do you know he's drunk?

"[Caller]:  Uh, he said so.

"[Dispatcher]:  Okay, so he's inside his vehicle?

"[Caller]:  He's, he's in the vehicle and this is like the third time that he came by uh threatening me here.  I'm, I was here alone today.

"[Dispatcher]:  Okay, and so is the vehicle running?

"[Caller]:  Yes.

"[Dispatcher]:  Okay.

"[Caller]:  Yes, the video, I mean the, the vehicle is running right now. [Unintelligible] in the vehicle.

"[Dispatcher]:  What kind of vehicle, what color?

"[Caller]:  In the vehicle it's a a tan Chevy Tahoe . . . uh . . . Suburban I guess.

"[Dispatcher]:  Okay, hold on just a moment here."

In the background, defendant yelled something unintelligible, and the caller asked, "Do you hear him yelling?"  The dispatcher responded, "Yeah, I do."

"[Dispatcher]:  Uh what you said he's a black male um, about how old would you say?

"[Caller]:  I don't know, like 50?

"[Dispatcher]: You know, what I wrote down for the license plate didn't actually work. Can you give it to me one more time?"

The caller gave the plate number again. Again, defendant yelled in the background. At one point, he yelled, "Ain't going to do nothing to me bitch."

"[Dispatcher]: What is he wearing, color, style?

"[Caller]: I don't know he's sitting in the car I can't really see what the hell he's wearing but he told me his name.

"[Dispatcher]: What name did he give you?

"[Caller]: Vernie Tidwell.

"[Dispatcher]: Okay.

"[Caller]: This is the third time that he comes out here. He just stands in front of the like the tent um and just yells all kinds of shit.

"[Dispatcher]: Why is he harassing you?

"[Caller]: I don't know. I honestly don't know. He came here earlier and, and talked to some uh there, there was a white girl like um that he talked to but she's not here and I don't know. I don't know what the heck is wrong with him. He said he wasn't drinking.

"[Dispatcher]: Okay, what's your name?

"[Caller]: Hm?

"[Dispatcher]: What is your name?"

The caller spelled her name.

"[Dispatcher]: Okay, I do have an officer on the way. Um, you haven't seen any sort of weapons or anything have you?

"[Caller]: Um, he said he has a gun.

"[Dispatcher]: Did you see a gun?

"[Caller]: Mm mm.

"[Dispatcher]: When did he say that?

11

"[Caller]:  I mean I was sitting in the tent like I-I wasn't going out you know what I mean?

"[Dispatcher]:  I understand.  So he was like just casually talking to someone and said he owns a gun?

"[Caller]:  No, he was yelling at me because I kept on yelling at him to get the hell out of here because like he's coming to me, I'm not, you know?

"[Dispatcher]:  Okay.

"[Caller]:  He's coming and standing in front of my place where I live and, and yells all this bullshit.  So um I don't know uh—it looks like he pulled into the apartment complex, or like right in front of it up there I don't—

"[Dispatcher]:  So, he drove into the complex?

"[Caller]:  Um, I'm not sure.  I'm not sure where he went.  But he's really—oh I think he's on the parking lot over there behind [the grocery store].  Only down um down a little way.  I'm not sure—

"[Dispatcher]:  Like towards the recycling area like the other side with the . . ."
The caller agreed.

"[Dispatcher]:  Alright miss, well since he's still out there and he's drunk we're gonna be sending an officer out that way we'll be there soon, okay?

"[Caller]:  Alright, thank you.

"[Dispatcher]:  Thank you, bye bye.

"[Caller]:  Mm hmm, bye."

*3.      Confrontation Clause*

Defendant argues the court erred in admitting the 911 call because it is testimonial. The Confrontation Clause of the Sixth Amendment bars the admission of testimonial hearsay from a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a previous opportunity for cross-examination.  (*Crawford, supra*, 541 U.S. at pp. 53-54.)  " 'The high court has yet to state definitively just what

12

facts conclusively demonstrate that particular hearsay qualifies as testimonial.' " (*People v. Alvarez* (2025) 18 Cal.5th 387, 461, italics omitted.)

*Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), which consolidated and decided two different state cases, offers some guidance: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822.)

In *Davis v. Washington*, No. 05-5224, a 911 caller told the emergency operator, " 'He's here jumpin' on me again.' " (*Davis, supra*, 547 U.S. at p. 817.) The caller answered questions about her location, whether the defendant had been drinking, the defendant's name, and whether there were weapons—" 'No. He's usin' his fists.' " (*Ibid*.) Later, the caller said the defendant had " 'just r[un] out the door' . . . , and that he was leaving in a car." (*Id*. at p. 818.) In concluding these statements were nontestimonial, the U.S. Supreme Court explained the caller "was facing an ongoing emergency" and "the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." (*Id*. at p. 827.) After the defendant drove away, the operator told the caller to " 'Stop talking and answer my questions.' " (*Id*. at p. 818.) The court explained that from this point on it could be argued the caller's statements were testimonial. (*Id*. at p. 829.)

Here, the caller began by explaining that a man was harassing her and answering questions about her location. At times, she talked while the dispatcher was talking. She stated defendant was drunk and driving, and answered questions about how she knew this

and the vehicle being driven, and answered questions about whether defendant had a gun and why he was harassing her. The caller described what was happening as it evolved to the dispatcher. Defendant could be heard in the background of the call. At one point, the dispatcher acknowledged he could hear defendant. Eventually, the caller described where defendant had driven to. Unlike in *Davis*, at that point the call ended.

The recording of the 911 call demonstrates that the caller was calling about an ongoing emergency and the dispatcher's questions were designed to assist law enforcement in meeting the emergency. Defendant argues the caller was not reporting an ongoing emergency, but relating a crime that had "essentially been completed." He asserts, inaccurately, that as the caller "was reporting this information, the harassment was not ongoing and she was no longer in the immediate vicinity of the harassing individual." In fact, defendant can be heard in the background of the call yelling at the caller. To the extent the record suggests defendant drove out of the caller's line of sight at the end of the call, given that defendant was intoxicated, this did not end the emergency the dispatcher was attempting to gather information about. The trial court did not err by concluding the admission of the 911 recording did not violate defendant's rights under the Confrontation Clause. We turn now to defendant's alternative assertion that the 911 call was inadmissible hearsay.

### 4. Spontaneous Statements

"A statement may be admitted, though hearsay, if it describes an act witnessed by the declarant and '[w]as made spontaneously while the declarant was under the stress of excitement caused by' witnessing the event." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809; see Evid. Code, § 1240 ["Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) [w]as made spontaneously while the declarant was under the stress of excitement caused by such perception"].) Defendant argues the trial court erred in admitting the 911 call under this hearsay

14

exception. " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) "Spontaneous statements are deemed sufficiently trustworthy to be admitted into evidence because ' " 'in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief.' " ' " (*Gutierrez, supra*, at p. 810.)

"The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*People v. Gutierrez, supra*, 45 Cal.4th at p. 811.) " 'A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was "time to contrive and misrepresent," ' such as 'the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 411.)

" 'Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact.' [Citation.] We review the trial court's ruling concerning whether a hearsay statement falls within the spontaneous statement exception for abuse of discretion. [Citation.] ' "[T]he discretion of the trial court is at its broadest" when it determines whether an utterance was made while the

15

declarant was still in a state of nervous excitement.'" (*People v. Mataele, supra*, 13 Cal.5th at p. 411.)

Defendant argues there is nothing in the caller's language that suggests any ongoing nervous excitement because she was describing past events. Defendant cites to a transcript of the 911 call that was not admitted into evidence rather than the call itself. Again, we disagree with defendant's characterization of the record. The caller was describing ongoing events, at times talking while the dispatcher was talking, and defendant can be heard yelling in the background of the call. The trial court did not abuse its discretion in admitting the audio recording of the 911 call as a spontaneous statement under Evidence Code section 1240.

C. *Racial Justice Act*

Defendant argues the trial court erred by not applying the proper standard of review at the prima facie stage under the Racial Justice Act. We disagree with the assertion that the proceedings reached that particular stage. Claims under the Racial Justice Act can arise in different procedural contexts such as in a motion pursuant to section 745 or in a petition for writ of habeas corpus alleging a violation of section 745, subdivision (a). (§ 745, subd. (b).) Defendant's reference to the prima facie stage refers to the fact that, "*[i]f a motion is filed in the trial court and* the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing."[8] (§ 745, subd. (c), italics added.) As we will explain, no such motion was made.

---

[8] At an evidentiary hearing, the parties may present evidence, and the defendant has the burden of proving a violation of section 745, subdivision (a) by the preponderance of the evidence. (§ 745, subd. (c)(1)-(2).)

### 1. Trial Court Proceedings

Prior to the preliminary hearing, defendant filed a *Marsden*[9] motion challenging his public defender. The court denied the motion. Eventually, the court appointed an attorney from the conflict criminal defense panel to represent defendant. Defendant made multiple *Marsden* motions against his new defense counsel, all of which were denied.

When the trial court denied defendant's third *Marsden* motion, it ruled that there was no deterioration in the relationship between defendant and defense counsel, noting that while defendant had a defiant attitude, defense counsel was still willing to work with him. After the trial court denied the motion, the following exchange occurred:

"THE DEFENDANT: I wish not to proceed. I'd like to seek my own counsel. I will attempt to get a—I don't want no one to go in my bank. There's too much adversity. This man has cussed me out. He has—he said it myself. He did not call me names because he knows he called me the N-word.

"[DEFENSE COUNSEL]: I don't use that word, Your Honor—

"THE DEFENDANT: He's lying. He knows—

"THE COURT: Hang on, hang on, [defendant], stop.

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: When I say stop it means stop.

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: You just made a very serious accusation.

"THE DEFENDANT: And I am telling the truth.

"THE COURT: And [defense counsel] I know that is a very serious accusation but again only one person can talk at a time.

---

[9] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

"[DEFENSE COUNSEL]: I apologize, Your Honor. I was very offended by that. I do not use that word. That's not in my vocabulary.

"THE DEFENDANT: I am in fear. I am serious, Your Honor.

"THE COURT: I understand you're in fear. I—I was relying on everything that [defense counsel] had said in regards to his representation. I have not made any—my findings so far have been solely on what [defense counsel] has said. [¶] I am now gonna say for the record that I have known [defense counsel] for years. I have known him both in and out of the courtroom. I have—I was . . . also a defense attorney for a number of years. And so I also have worked with [defense counsel]. I don't know if we ever had any cocounsel cases together. But—

"[DEFENSE COUNSEL]: Maybe my brother but not myself.

"THE COURT: Right. And so—but I do know his representation [*sic*] in and out of the courtroom. And if it's gonna become a credibility issue between the two of you on whether or not he actually said that, I'm going to side with [defense counsel] respectfully."

The record does not reflect any time defendant repeated this specific allegation or mentioned the Racial Justice Act. After the court denied defendant's fourth *Marsden* motion, it granted defendant's *Faretta*[10] motion to represent himself. While defendant represented himself, he interrupted court proceedings with various outbursts. The trial court repeatedly warned defendant that if he did not follow the court's rules, he would lose the right to represent himself. The court appointed defendant's prior counsel as standby counsel. After defendant repeatedly interrupted the prosecutor's opening statement, the trial court ruled that defendant had lost the right to represent himself and reappointed his standby counsel as defense counsel. Defense counsel informed the trial

---

[10] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

court that he had been advised to "refuse representation of [defendant] at this time based on . . . the [R]acial [J]ustice [A]ct. I believe that may create an appellate issue in the future, and by having me on this case, again, um, based on his accusations alone . . . ." The record indicates this was the first mention of the Racial Justice Act. The court asked which part of section 745 defense counsel was referencing. Defense counsel read and cited section 745, subdivision (a)(1):

"The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence, any of the following: [¶] (1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin."[11] Defense counsel explained defendant "has accused me of calling him a racial slur in the past, and I believe that might create a conflict in this case." Defense counsel denied ever using a racial slur.

The trial court responded, "Well then that doesn't constitute a requirement that you recuse yourself or that you be declined as counsel in the case. [¶] A person doesn't get to make accusations just to control the proceedings. That's what he would be doing. So unless you made a racial statement relative to this Defendant, unless his statement against you is true, you are representing him in this case."

Defense counsel explained he had been instructed by the conflict panel to decline representation "based on the accusation alone." After the court noted that defense

---

[11] Section 745, subdivision (a)(2) provides that a violation is established if the defendant proves, "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful."

counsel had already been appointed, defense counsel responded, "I was in the past, yes, Your Honor. And they said based on the fact I'm on standby right now, they . . . advised me that I should decline representation today based on that and get a new attorney involved who has not had the accusation." The trial court ordered an administrator of the conflict panel to the courtroom, and the head of the conflict panel appeared. She explained, "that the direct allegation that was made would trigger [the R]acial [J]ustice [A]ct, I believe, and I would rather deal with it here than wait for the appellate courts."

The court responded as follows:

"Let me suggest a different construct within which to view this. [¶] The [R]acial [J]ustice [A]ct does not stand for the proposition that a defendant may control proceedings, have lawyers replaced, have judges replaced, whatever the circumstance may be, change trial dates and so forth and so on simply by making an unfounded accusation.

"[Defense counsel] represents to the Court that he never used a racial slur in connection with any conversation with [defendant]. [¶] So I respectfully disagree with the position that you're advancing here, that simply when a Defendant says, [']Oh, this lawyer used an inappropriate racial term in reference to me or in a conversation with me, I don't want him,['] therefore he gets a new attorney.

"As you may know, this won't surprise you, there have been several [*Marsden*] motions on the way to the case getting here.

"[¶] . . . [¶]

"And the last [*Marsden*], which was last week, the Defendant lost the [*Marsden*] again and then requested [*Faretta*] status. The judge presiding over that granted the [*Faretta*] status. The Defendant refused to waive time to get ready for trial. [¶] Then came in and said, after he wouldn't waive time and had to go to trial without any delay, that he hadn't had a chance to see all the discovery because the redaction hadn't been completed. He had seen some of the discovery but not all.

20

"So after conferring with the parties, I arranged to have all that redaction completed.  You may be aware of this, I don't know, but we had all the redaction completed in a quick turnaround.  Had the video in the case made available to the Defendant.  He represented that he hadn't seen some of it or maybe all of it.  Whether that's true or not I don't know, but we made sure that he got that, and [defense counsel] was of significant help in that regard.

"So after that was done and the jury was released for the day—we went dark for a day to give [defendant] an opportunity to review all of this, he then claimed that he didn't want to have that happen, he wanted to move ahead the same day.

"He had been told repeatedly that if he refused to follow the rules of the Court, that he was going to lose his pro per status, and on a dozen or more occasions, probably a score or more, he blatantly refused to follow the rules, and after multiple warnings, his status, pursuant to [*Faretta*], to represent himself was withdrawn by the Court today.

"[¶] . . . [¶]

"And based upon appointment of [defense counsel] yesterday—no, the day before yesterday and the formal signing of the contract in that regard yesterday, [defense counsel] was here today as standby counsel, and when, during the course of this morning's proceedings, it came to the point where [defendant] had to be relieved of representing himself, then I appointed [defense counsel] as full counsel, not standby counsel.

"At that point [defense counsel] advised the Court that he'd been informed by the panel not to accept the appointment because of [section] 745[, subdivision ](a)(1).

"This is, in the Court's view, a misreading of [section] 745[, subdivision ](a)(1). That constitutes an abuse of the proceedings, because that reading of [section] 745[, subdivision ](a)(1) permits any defendant to simply make an accusation, it could even be mid-trial, against a lawyer that he's a racist, did this and did that, and then if the position of your office is that, [w]ell, we are going to throw up our hands because we don't want

21

to have to address this on appeal, that I think throws a wrench into the gears of the judicial system. I don't think [section] 745 was intended to advance that proposition.

"[¶] . . . [¶]

"And so my position on it is that this is on the Court. The Court is ordering the appointment pursuant to the contract.

"I can respect and have no issue with the panel through [defense counsel] or through you indicating your concerns, if you still have them, about this, but I feel pretty strongly that it's not within the province of the Defendant to simply make an accusation which is baseless, according to the lawyer, and the Court have [*sic*] to throw out a jury that's been selected, appoint another lawyer and reset the trial for down the road. [¶] Let me—I just want to frame it for you and then see what you think in response to that."

The head of the conflict panel responded that "there are layers upon layers that [she] was not aware of" including the Court's impression that section 745 was being used to delay trial after defendant refused to waive time. Further, she stated that if the court had made the decision that it did not believe section 745 applies, "it's preserved for the record, and I think we should go forward with the trial."

### 2. *No Motion Was Filed*

On appeal, defendant argues the court erred by making credibility determinations at the prima facie stage. This argument is based on *Finley v. Superior Court* (2023) 95 Cal.App.5th 12 (*Finley*), a case in which the defendant filed a motion under the Racial Justice Act and the trial court denied the motion for failure to state a prima facie violation of the Racial Justice Act. (*Id*. at p. 16.) The *Finley* opinion addressed "the prima facie standard under the Racial Justice Act." (*Id*. at p. 20.) The Court of Appeal explained that "a defendant seeking relief under the Racial Justice Act must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim. The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the

allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records." (*Id*. at p. 23.) The appellate court held the trial court "applied an incorrect standard of review at the prima facie stage" because it weighed the evidence "rather than focusing on and accepting as true the evidence that supported Finley." (*Ibid*.)

Defendant asserts *Finley* is directly applicable. It is not. Here, no motion was made under section 745, and the trial court did not deny any motion for failing to state a prima facie violation. Defendant raised the factual assertion that defense counsel "called me the N-word" after the trial court denied a *Marsden* motion. The Racial Justice Act was never mentioned until two months later when defense counsel informed the trial court that he had been advised to "refuse representation of [defendant] at this time based on . . . the [R]acial [J]ustice [A]ct. I believe that may create *an appellate issue in the future*, and by having me on this case, again, um, based on his accusations alone." (Italics added.) Defense counsel did not argue any violation of the Racial Justice Act had been committed. Indeed, defense counsel asserted defendant's earlier accusation that he had used a racial slur was false. Defense counsel argued he was permitted to refuse to represent defendant based on this false accusation against him to prevent a claim under the Racial Justice Act being raised in the future.

Defendant acknowledges that, as explained in *People v. Midell* (2025) 113 Cal.App.5th 1060, no authority has held that courts have a sua sponte obligation to investigate potential Racial Justice Act violations by defense counsel. (*Id*. at pp. 1076-1077.) Defendant argues that "whether or not the court could have ignored the issue in the absence of a formal motion, it chose not to do so and addressed the claim of a violation of the Act, as well as the credibility of [defendant]" "presumably treating it as if raised by formal motion" and "ignored the procedures outlined in the Act." We disagree that the court treated the situation as though a motion alleging a violation had been made under the Racial Justice Act. The court addressed defense counsel's assertion that he

could refuse to represent defendant based on a false accusation. Defendant argues he is entitled for a remand for a new prima facie hearing despite the fact there is no pending motion on which to conduct a prima facie hearing. We cannot conclude the Racial Justice Act permits the remedy defendant seeks. Defendant argues a motion or habeas petition in the trial court are not the only ways to raise a claim under the Racial Justice Act. (§ 745, subd. (b).) Regardless, his argument relies on the trial court's obligation to analyze whether the defendant has made a prima facie showing when a motion in the trial court has been filed. (§ 745, subd. (c).) Here, no motion was filed and thus the trial court did not err by not analyzing whether defendant had made a prima facie showing in the motion he did not make.

D.     *Defendant's Removal from Trial*

Defendant argues the court erred in removing him from a critical phase of his trial. In particular, he argues that while it is reasonable to conclude he waived his right to be present when he declined to testify and participate during the first phase of trial, he did nothing to explicitly or implicitly waive his right to be present during the second phase of trial regarding his prior conviction.

1.     *Trial Court Proceedings*

As we have previously indicated, defendant lost the ability to represent himself because of his outbursts during opening statements.

The outbursts continued during the prosecution's presentation of evidence. After the court admitted a video of defendant's forced blood draw:

"[DEFENDANT]: I mean, what's the point of that? You don't see the forced blood draw.

"THE COURT: Please be quiet, Mr. Tidwell.

"[DEFENDANT]: You guys are just doing anything you want.

"THE COURT: Mr. Tidwell, you will be removed from the court if you interfere with the proceedings. You may speak to your lawyer privately and quietly."

24

Next, the prosecution attempted to authenticate a video clip from defendant's field sobriety test, but defendant interrupted to say, "Show the entire clip."

When the prosecution moved on to the next exhibit, defendant interjected, "They are trying to railroad me." The trial court warned defendant, "if you continue to interfere with the proceedings, you will be removed from the courtroom, and the trial will proceed without your presence."

When the prosecution called its next witness, defendant's interruptions continued:

"[DEFENDANT]: Officer Wence? He did not—

"THE COURT: Be quiet, Mr. Tidwell.

"[DEFENDANT]: This is—

"THE COURT: Remove Mr. Tidwell from the courtroom.

"[DEFENDANT]: They are railroading me. He wants to do that. You know they did it. That truck right there, I haven't seen it in a year and a half, and they took it.

"THE BAILIFF: Do you want your paperwork?

"[DEFENDANT]: Where is Officer Wright?· When will he be here? I told Wence at the hospital, You stole my money.

"THE COURT: [Defendant], before we resume in the morning, we will inquire if you wish to participate in the trial and follow the rules. If you do, you will be brought in. If you don't, you won't." Before the court recessed for the day, it stated, "The record should reflect that during the last break, the Court had [defendant] brought back up and was intending to have him participate in the continuing proceedings after the break. He was refractory and fractious and obnoxious and consequently was removed, but the jurors were not present."

The next morning, defendant refused to come to court and refused to get dressed. The court issued an extraction order to bring him to court. The court attempted to make a record regarding whether defendant wanted to testify, but defendant repeatedly

25

interjected that the court was lying and he was not dressed.  Their discussion continued as follows:

"THE COURT:  Do you want to—

"THE DEFENDANT:  I can't do it.  I'm not dressed.  I believe they broke my—

"THE COURT:  We'll get you dressed out.

"THE DEFENDANT:  I believe they broke my rib.

"THE COURT:  We'll get you dressed out.

"THE DEFENDANT:  I have no more—no more to say.  [¶]  He needs to release that statement.  I asked him many times, but he will not release it.  And I asked him—

"THE COURT:  If you want, we'll get you dressed out.  We're going to bring the jury in, but I don't want to bring the jury in until you are dressed out, unless you refuse to be dressed out and refuse to cooperate, refuse to follow the rules.

"THE DEFENDANT:  Just not following the rules?  I have a right to refuse court . . . because I—I'm not being treated well.

"THE COURT:  All right.  We are going to proceed with the trial without you because you refuse follow the rules."

During the reading of the verdict, defendant was present and interrupted to say, "That's fucked up."  The court informed defendant that if he did not behave himself, he would be removed from the courtroom.  Defendant told the court he wanted to be removed.  After the rest of the verdict was read outside of his presence, the court brought defendant back in to see if he wanted to be present for the second phase of trial.  The following exchange occurred:

"THE COURT:  [Defendant], we are about to begin the second trial.  This is the trial to determine whether you were convicted of violating Section 422 of the Penal Code in 2019.  Again, you are to be present at this trial unless you won't follow the rules.

"THE DEFENDANT:  Your Honor, Your Honor, could you please stop being kind.

"THE COURT:  Go ahead and take him out.

26

"THE DEFENDANT:  You're being kind to me.

"THE COURT:  He's not going to follow the rules.

"THE DEFENDANT:  And railroad me, and this is messed up to me and my family."

Defendant was brought back to court for the reading of the verdicts as to the second phase of trial, at which time he repeatedly interrupted the reading of the verdict and the court had him removed again.

### 2. *Waiver of Right to Be Present*

"A criminal defendant, broadly stated, has a right to be personally present at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment; the due process clause of the Fourteenth Amendment itself; section 15 of article I of the California Constitution; and sections 977 and 1043." (*People v. Waidla* (2000) 22 Cal.4th 690, 741.)  However, "a defendant may waive his right to be present at his trial by being disruptive at the trial." (*People v. Welch* (1999) 20 Cal.4th 701, 773.)  Section 1043 addresses this situation and provides in relevant part:

"The absence of the defendant in a felony case after the trial has commenced in their physical presence shall not prevent continuing the trial to, and including, the return of the verdict in . . . [¶] (1) Any case in which the defendant, after being warned by the judge that they will be removed if they continue their disruptive behavior, nevertheless insists on acting in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with the defendant present in the courtroom." (§ 1043, subd. (b).)  Further, "[a]ny defendant who is absent from a trial pursuant to paragraph (1) of subdivision (b) may reclaim the right to be present at the trial as soon as they are willing to act consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." (§ 1043, subd. (c).)

"[A]ppellate courts must give considerable deference to the trial court's judgment as to when disruption has occurred or may reasonably be anticipated." (*People v. Welch, supra*, 20 Cal.4th at p. 773; see also *People v. Bell* (2019) 7 Cal.5th 70, 116 ["We generally defer to the trial court's determination as to when a disruption has occurred or is likely to occur"].) In particular, "[w]hether it makes sense to expect a defendant in a given case, once removed from the trial, to actually abandon a strategy of disruption and conform to courtroom decorum if allowed to return depends to a large extent on nuanced assessment of the severity and persistence of the disruptive conduct. The trial court is best situated to evaluate the defendant's conduct and the likelihood of further disruption." (*People v. Johnson* (2018) 6 Cal.5th 541, 560.)

Defendant essentially argues the court erred because at the time he was removed for the last time, he had done nothing disruptive, and this was insufficient to constitute a waiver of his right to be present at the second phase of trial and sufficient to reclaim the right to be present. We disagree. By this point in the proceedings, defendant had already been warned about his disruptive behavior and properly removed, and defendant's pattern of disruption was escalating and consistent when he made the remark, "could you please stop being kind." It was reasonable for the trial court, who could evaluate defendant's tone and demeanor, to interpret defendant's remark as disruptive and disrespectful, and indicating an intent to continue to disrupt proceedings and an unwillingness to act in a manner sufficient to reclaim his right to be present under section 1043, subdivision (c). Defendant had, at that point, demonstrated an inability to stay in the courtroom for any length of time without disrupting proceedings. The trial court was best situated to evaluate defendant's conduct and the likelihood of further disruption, and we see no basis to set aside its decision to remove defendant from the second phase of trial.

E.      *Alleged Clerical Errors*

Defendant argues two clerical errors require correction. First, he contends the abstract of judgment incorrectly reflects that the jury found true two prior conviction

28

allegations even though a second prior conviction allegation was not submitted to the jury. Second, he contends the sentencing minute order reports that 60 days was imposed for count three and ordered to run consecutively even though the court specified that the term would be imposed to run concurrently. The People only contest the second issue, but raise a related assertion of clerical error with respect to custody credits.

"An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Likewise, the oral pronouncement of judgment controls over the clerk's minute order. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)

As to the first alleged clerical error raised by defendant, the abstract of judgment currently indicates in section 1 that the court imposed a two-year sentence on count one and indicates in section 3 that the court imposed a two-year sentence "enhancement" under section 667, subdivision (e)(1) while a second "enhancement" under section 667, subdivision (e)(1) was stayed. The People concede that only one prior conviction was found true by the jury and further explain that what the jury found true was a prior strike allegation rather than a sentencing enhancement,[12] thus all of the entries should be removed from section 3 of the abstract of judgment, and instead a four-year sentence (doubled from two years for the strike prior) for count one should be reflected in section 1 of the abstract of judgment. This is the judgment the court orally pronounced. We accept the People's concession and direct the trial court to issue an amended abstract of judgment making these corrections.

---

[12] "It is . . . well established that the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense." (*People v. Burke* (2023) 89 Cal.App.5th 237, 243.)

29

As to the second alleged clerical error raised by defendant, the People argue that the clerk's minute order conforms to the court's oral pronouncement of judgment: "For . . . Count 3, I am imposing a sentence of 60 days, and for Counts [5] and [6], I am imposing a sentence of 60 days each on those. However, *those sentences* will run concurrently."[13] (Italics added.) The court further explained that defendant had custody credits for 200 days of actual time and it was "taking 60 days off" and "imposing the 60 days as actual time in, and the remaining 140 days that remains is actual time credit that [defendant] has as he goes off to prison, and with good time/work time on that, another 140 days, for a total of 280 days credit." This brings us to the People's assertion that the abstract of judgment must be corrected to reflect the court's oral pronouncement of custody credits: 140 days of actual time and 140 days of conduct credits for a total of 280 days. The abstract of judgment and sentencing minute order currently reflect 200 days of actual credits and 200 days of conduct credits for a total of 400 days. On reply, defendant states merely that he "submits that the abstract of judgment accurately reflects the clerk's transcript of the proceedings and accurately reflects the sentence imposed." We will direct the trial court to issue an amended abstract of judgment and corrected minute order conforming to the court's oral pronouncement of judgment. The trial court shall correct the sentencing minute order to reflect time served rather than a 60-day consecutive sentence on count three. The trial court should correct the sentencing minute order and amend the abstract of judgment to reflect 140 days of actual time and 140 days of conduct credits for a total of 280 days of custody credits.

---

[13] The court then proceeded to explain that while in its judgment "those do not 654, but just for the sake of assuring that the issue doesn't further present, I will stay the 60 days for Counts [5] and [6] to [section] 654, although it's my judgment they do not 654."

## III. DISPOSITION

The court is directed to prepare an amended abstract of judgment and sentencing minute order to conform to the jury's finding of only one prior strike and the court's oral pronouncement of judgment. The amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. The judgment is affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

DUARTE, Acting P. J.

/S/

_____

MESIWALA, J.

31